UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

RANDY J. BROEHM,

        Plaintiff,

        v.                      Case No. 19-C-1186

ANDREW M. SAUL,
Commissioner of Social Security,

        Defendant.

## DECISION AND ORDER REVERSING DECISION OF COMMISSIONER

        Plaintiff Randy Broehm filed this action for judicial review of a decision by the Commissioner of Social Security denying his claim for disability insurance benefits under Title II of the Social Security Act. In his most recent decision, the Commissioner concluded that Plaintiff was ineligible for benefits because he had continued to engage in substantial gainful activity as the proprietor of a family sheep farm. Alternatively, the Commissioner concluded that Plaintiff was not disabled because he retained the residual functional capacity to perform his previous job. For the reasons that follow, the decision of the Commissioner will be reversed and the case remanded for further proceedings.

## BACKGROUND

        This case has a long and unusual history. Plaintiff filed an application for disability insurance benefits in December 2010. R. 162. Initially, he alleged his disability onset date as November 15, 2008. R. 168. He listed club foot, knee and ankle surgeries, hamstring pulls/tears, pinacular tendon tear in left foot, arthritis, and weight increase due to limited physical activities as the conditions that limited his ability to work. R. 208. Plaintiff later amended his onset date to

October 10, 2010. R. 1552. After his claim was denied initially and on reconsideration, a hearing was held with administrative law judge (ALJ) Thomas A. Ciccolini on June 4, 2013. R. 20. In a nine-page decision dated July 9, 2013, ALJ Ciccolini found that Plaintiff was disabled from November 15, 2008, through June 30, 2010, but that he was no longer disabled after that time. R. 28. The ALJ reached this conclusion notwithstanding Plaintiff's amendment of his onset date to October 23, 2010, when he last had full-time employment. R. 70–71. Plaintiff appealed, claiming that his disability continued beyond October 2010, but was denied review by the Appeals Council. Pursuant to a joint stipulation of the parties, the district court remanded Plaintiff's claim with direction for the ALJ to hold a new hearing and issue a de novo decision. R. 967.

ALJ Timothy J. Malloy held a hearing on July 7, 2016, and, in an eight-page decision dated October 6, 2016, found that Plaintiff was not disabled at any point from the November 2008 alleged onset date through December 2015 because he was engaged in substantial gainful employment throughout that period of time as the proprietor of the family sheep farm. ALJ Malloy recommended the initiation of an overpayment action to recoup the benefits paid under the partially favorable decision that was previously issued. R. 1638. Plaintiff appealed this decision, and the case was yet again remanded pursuant to a joint stipulation of the parties. R. 1655. On remand, the Commissioner was to instruct the ALJ to reevaluate whether Plaintiff was engaged in substantial gainful activity and, if not, proceed with the sequential evaluation process (and, if necessary, obtain supplemental vocational expert evidence). *Id*.

On October 25, 2018, ALJ Timothy Malloy conducted a third hearing in Milwaukee, Wisconsin, where Plaintiff, who was represented by counsel, and a vocational expert (VE) testified. R. 1579. The ALJ opened the hearing by noting that Plaintiff had participated in two previous hearings and that the ALJ issued the immediately prior decision in his case. *Id*. The ALJ

2

noted he had to comply with the remand order. R. 1580. The ALJ also observed that Plaintiff had been given benefits for a closed period by a different ALJ that "appears to be problematic" but was not presently at issue before him at the moment. *Id*. For this case, the ALJ said the remand order required him to reevaluate Plaintiff's substantial gainful activity, if any, and expand the record with vocational testimony, if necessary. R. 1581.

At the time of the third hearing, Plaintiff was 48 years old. R. 1583. Plaintiff is a college graduate and has an associate degree in marketing and a bachelor's degree in management. *Id*. Plaintiff testified he is not working because he is disabled. *Id*. Plaintiff last worked in October 2010 in business and sales for West Business Services. R. 1583–84. He had previous jobs in sales and also worked in the shipping department of a factory. R. 1584. Plaintiff testified that the only income he was then receiving was child support payments from his first ex-wife. R. 1583.

Plaintiff testified that he had been living on a farm with his sons and his mother. R. 1585. Plaintiff agreed that he previously told the ALJ and another judge that this was a "hobby farm." *Id*. The ALJ then questioned Plaintiff about tax returns Plaintiff filed, each of which included Schedule F (Profit or Loss From Farming), and named Plaintiff as the proprietor and sheep as the principle crop or activity. *Id*. Referencing a letter indicating that Plaintiff "did materially participate in the business of sheep farming," the ALJ noted "[t]here's a difference between running a hobby farm and having—and being in business with farming." R. 1586. Plaintiff agreed but stated that "we spend money, but I have never made money" and that he "consider[s] [it] more as a hobby because I do not make income off of it, where I can solely live off that income." *Id.*

The ALJ questioned Plaintiff about representing to the IRS that he materially participated in the business while at the same time representing that he did not for social security purposes and that it was solely a hobby farm. *Id*. Plaintiff testified that he worked about seven hours per week

3

on the farm and said he had always worked a separate full-time job for his family's primary source of income. R. 1587–88. Plaintiff added that the family did the farm "on the side" to teach his kids responsibility and that it had a lot of expenses that they deducted from whatever income he received. R. 1589. He testified that his mother owns the farm, his sons own the animals, and he never owned the farm. *Id*. He reiterated that the farm never made a profit, though they did sell animals that helped cover the costs of running the farm and came close to breaking even one year. R. 1590. The farm also received subsidies for selling wool from the Department of Agriculture. R. 1590–91. Plaintiff agreed with the ALJ that he had told the IRS he was substantially engaged in the business of farming in returns filed for the years 2010 through 2013. R. 1551, 1591. Plaintiff also testified that he has always had an accountant prepare his taxes and has no education in the tax code—nor does he understand how the IRS defines a hobby as compared to a business. R. 1611–12.

Plaintiff next described his medical and work history. In 2008, Plaintiff had surgery on his lower left foot. R. 1592. At the time, he was performing sales work that was sedentary in nature. *Id*. Before he had the surgery, he worked at a desk in sales for about three years. R. 1593. He returned to the sales job after the surgery and worked for about a year while in a wheelchair. *Id*. His doctor told him to use the wheelchair to elevate his foot and reduce the swelling, according to Plaintiff. R. 1595. While in a wheelchair, Plaintiff stated that his employer provided some accommodation to access the building. R. 1597. Plaintiff said he was terminated from the sales job at West Business Services twice, initially after his first or second surgery after which he was rehired to a different team. R. 1595–96. Plaintiff said he returned to the job after his third surgery but was then terminated again in October 2010. R. 1583, 1596. Plaintiff testified that the company was downsizing at the time it fired him and suspected it fired others because they had medical

4

issues. R. 1598. Plaintiff also testified about past work for a shipping company (where he lifted boxes generally around 50 pounds and sometimes up to 75 pounds) and at a plastics company where he operated an injection molding machine. R. 1616.

Plaintiff said he has had additional leg problems. About three years ago Plaintiff felt his tendon rupture while he was watching television and his doctor put him in a cast. R. 1601. He testified that problems with the swelling continue to limit his mobility. *Id.* Plaintiff said he does some walking to help with his diabetes and agreed he can walk for 60 minutes. R. 1602. Plaintiff stated that his previous right foot issue had improved. R. 1606. He said he agreed with a physical therapist who said he had ambulation tolerance, standing tolerance for one hour, and minimal pain with stairs and squatting. R. 1606–07.

Plaintiff stated he is prevented from performing an office job because he cannot keep his foot elevated above waist level for 75 percent of the day. R. 1607. Plaintiff said this is consistent with his practice at home—using a recliner or pillows on the couch to keep his foot up. *Id.* He has slept in a non-regular bed since his first surgery. R. 1603. At his prior job, Plaintiff said he was able to elevate his foot, but it was not over his waist like his doctors suggested to address his swelling. R. 1603–04.

Plaintiff also discussed his Crohn's disease, which he estimated he had for about four years. He stated he has had "a lot" of infections and had just been started on Remicade infusions to aid the infections and inflammation in his intestinal tract. R. 1605. Plaintiff said his Crohn's disease requires bathroom breaks to an extent that would prevent him from doing an office job—estimating he required four to five bathroom breaks per day. R. 1607–08. In addition to Remicade, Plaintiff takes Metformin and Glimepiride for diabetes. R. 1608.

5

In a fifteen-page decision dated December 19, 2018, the ALJ concluded that Plaintiff was not disabled at any time from October 10, 2020—the amended alleged onset date—through December 31, 2015.  R. 1552–66.  The ALJ's decision followed the five-step sequential process for determining disability prescribed by the Social Security Administration (SSA).

At step one, the ALJ determined that Plaintiff had engaged in substantial gainful activity from the amended alleged onset date of October 10, 2010, through December 31, 2015, the date he was last insured.  R. 1554.  In so ruling, the ALJ noted that "substantial gainful activity" is work activity that involves doing significant physical or mental activities or any "gainful work activity" that is "usually done for pay or profit, whether or not a profit is realized."  R. 1555 (quoting 20 C.F.R. § 404.1572(a), (b)).  Based on Plaintiff's description of his participation in the farming operation and his tax filings taking advantage of those operations, the ALJ concluded that Plaintiff had engaged in substantial gainful activity.  Although tax records for later years were not in the record, the ALJ nevertheless concluded that, because Plaintiff continued to engage in the same general activities, his substantial gainful activity continued as well.  Because of the absence of additional tax records, however, the ALJ proceeded to the next step of the sequential evaluation.  But before doing so, the ALJ explicitly noted his conclusion that Plaintiff had "engaged in fraud or similar fault regarding his statements to the federal government that cannot be reconciled, are *materially* false, and provided with the intent of obtaining benefits."  R. 1557 (italics in original).  In the view of the ALJ, Plaintiff "has sought substantial tax benefits available to those in the business of farming and accepted farming [wool] subsidies from another federal agency while at the same time seeking disability."  *Id.*

At step two, the ALJ determined that Plaintiff had the following severe impairments: left ankle arthrosis, status post clubfoot deformity, and degenerative joint disease.  *Id*.  The ALJ then

6

concluded at step three that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 1558.

The ALJ proceeded to assess Plaintiff's residual functional capacity (RFC). He found that Plaintiff had the RFC to perform sedentary work except that Plaintiff "must be provided assistance to his workstation and allowed to sit in a wheelchair with his leg elevated." R. 1559. To formulate this RFC, the ALJ considered Plaintiff's medical history and the extent to which his symptoms are consistent with the objective medical evidence. The ALJ noted that Plaintiff was diagnosed with left ankle arthrosis and a history of left club foot and had a surgical correction and bone graft in 2008 and 2009, respectively. R. 1559.

At step four, the ALJ concluded that Plaintiff could perform past relevant work as a business services sales agent. R. 1564. The ALJ relied on the testimony of the VE that a hypothetical person with the age, education, work experience, and RFC of Plaintiff could perform past relevant work. R. 1565–66. Because Plaintiff's previous employer provided him accommodations for his impairments at work, the ALJ also considered guidance provided by POMS DI 25005.20. *Id*. According to this guidance, if a prior employer provides accommodations that would allow Plaintiff to work with his current impairment, Plaintiff is able to do past relevant work even if another workplace does not provide the same accommodations. *Id*. The ALJ found these guidelines applicable. *Id*. Accordingly, the ALJ concluded that Plaintiff was not disabled. R. 1565. The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. R. 1.

## LEGAL STANDARD

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is "such relevant evidence as a reasonable mind could accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

## ANALYSIS

Plaintiff first argues that the ALJ improperly determined that he had engaged in substantial gainful activity from 2010 to 2015. The ALJ, Plaintiff argues, erroneously relied on his tax returns to find that he had engaged in substantial gainful activity and failed to adequately develop the record and properly apply the relevant tests. To Plaintiff's argument that the ALJ erred in his analysis of whether Plaintiff's work on the family farm constituted substantial gainful

8

employment, the Commissioner offers no response, thereby waiving the issue. *See Delapaz v. Richardson*, 634 F.3d 895, 900 (7th Cir. 2011) ("As the district court noted, appellants did not address that argument in their response brief below. Consequently, they waived the issue."); *see also Hicks v. Midwest Transit, Inc.*, 500 F.3d 647, 652 (7th Cir. 2007) (arguments not raised before the district court are waived on appeal). What remains for review is the Commissioner's decision that Plaintiff retained the RFC to perform his previous job as a business services sales associate at West Business Solutions. Unfortunately, the ALJ's analysis of the evidence is so incomplete and inconsistent that it fails to provide a logical bridge to his conclusions.

Dr. Eric Malicky, Plaintiff's treating orthopedist, wrote a letter to Plaintiff's attorney on June 20, 2013, expressing his agreement that "[Plaintiff's] full-time work restrictions should allow him to elevate his legs to the waist level 75% of the time due to his underlying left ankle arthritis with previous clubfoot surgery." R. 868. Dr. Malicky's "agreement" was apparently with Plaintiff's previous orthopedist, Dr. Tracy Rupke, who on January 3, 2012, sent Plaintiff's attorney a completed "Physical Residual Functional Capacity Questionnaire," which she completed on April 20, 2011, in which Dr. Rupke likewise concluded that Plaintiff would need to elevate his leg to waist level for 75% of the working day. R. 458. In her January 3, 2012, letter accompanying the Questionnaire, Dr. Rupke further opined that Plaintiff would be absent from work more than four days per month "given his current level of symptoms." R. 455. Based on the ALJ's description of the evidence of record, these limitations seem extreme.

Plaintiff's original application for disability benefits in December 2010 listed his disabling impairments as congenital left clubfoot deformity; left ankle arthrosis; hamstring tendinitis; and bilateral knee pain. R. 23. Plaintiff underwent subtalar and naviculocuneiform fusions and an anterior ankle cheilectomy in 2008, while still employed. R. 24. He had a delayed union of the

9

navicular cuneiform fusion site and required a delay bone grafting a few months later in 2009. Right knee arthroscopy was done in January 2010. In April 2010, Plaintiff underwent left ankle hardware removal and tendon and brevis repairs. R. 1559. Plaintiff continued working full-time after he recovered from his surgeries until mid-October 2010.

X-rays of the left ankle in June 2010 showed a relatively well preserved tibiotalar joint space, with some narrowing involving the subtalar joint, but overall alignment within normal limits. October and December 2010 X-rays showed fusion of the naviculocuneiform joint primarily at the medial aspect and some degree of the degenerative change in the talonavicular joint. December 2012 and September 2013 X-rays and CT scan showed a solid subtalar joint fusion, significant flattening of the talus, moderate midfoot exostosis, and significant tibiotalar joint arthritis with varus tilt of the ankle. R. 1560.

Treatment notes document Plaintiff's complaints of joint pain and intermittent swelling in the left ankle and foot, as well as clinical findings of limited left ankle mobility. A May 2013 X-ray showed degenerative changes of the mid-foot and tiny plantar calcaneal spur, and generalized soft tissue swelling without bony destructive process or fracture. The record revealed that Plaintiff's treatment consisted of a brief course of prescription pain medication, physical therapy, intermittent corticosteroid injections, and use of an over-the-counter ankle brace. *Id.*

The ALJ noted that other than a period of healing following his last left ankle surgery in April 2010, Plaintiff generally retained normal strength, range of motion, and sensation in the extremities, with the exception of limited left ankle range of motion and decreased sensation over the distal aspect of his left foot. Plaintiff also retained normal gait and station. For example, the ALJ noted that at a late April 2010 post-operative visit, Plaintiff had intact neurovascular left foot function, palpable pulses, intact sensation to light touch, and the ability to wriggle his toes.

10

Although he wore a CAM boot, there was not mention of an assistive device. In December 2020, Plaintiff reported he had been doing relatively well until two months prior when he was standing watching a football game and had increased left ankle pain and some problems with swelling, which improved with elevation. R. 1560–61.

Throughout his decision, the ALJ recounts repeated findings after the surgeries of normal gait and station, no gross motor defects, and normal strength and intact sensation in upper and lower extremities. Medical records described show improvement with routine and conservative treatment. For example, when Plaintiff established care with Dr. Malicky in December 2012, after Dr. Rupke moved away, he reported left ankle stiffness and pain, without relief from ankle brace or injections. Upon examination, however, Dr. Malicky found some limitation in range of motion, as well as pain with dorsiflexion, but Plaintiff retained 5/5 motor strength with plantar flexion and dorsiflexion of the left ankle. He had intact sensation in the left foot. He underwent an injection and Dr. Malicky advised use of an over-the-counter ankle brace, but there is no suggestion of the use of any assistive device like a cane, crutches, or wheelchair. At a January 2013 primary care visit, Plaintiff had normal gait and station. He reported his left foot was sore but tolerable and indicated he wanted to hold off on any further treatment at that point. R. 1561–62.

Plaintiff returned to Dr. Malicky in September 2013, reporting increased left ankle stiffness and weakness. Dr. Malicky recommended a heel lift and ankle brace and a total left ankle replacement. Plaintiff stated he was unable to consider surgery at that time, and according to the ALJ, there is no indication he pursued further treatment for his left ankle thereafter. Instead, the record suggests Plaintiff's pain was adequately managed with steroid injections and did not require ongoing use of prescription pain medication or surgical intervention. "In sum," the ALJ

11

concluded, "the claimant's treatment history is not consistent with allegations of debilitating physical impairments." R. 1562.

The ALJ also noted that the nature and scope of Plaintiff's reported activities were not consistent with a finding of debilitating physical impairment. Plaintiff reported in a December 2010 Function Report that he lived on a hobby farm with about thirty sheep and that he helped his four sons water and feed the sheep and clean their pens. He drove his sons to and from school as needed and also drove his parents around town to run errands. He did light chores like cooking, vacuuming, laundry, and shopping; and he attended his sons' sporting events and Bible study twice per week at his church. And although he reported that he is unable to sit, stand, or walk for prolonged periods, he also claimed he sat with his leg elevated for most of the day. Yet, in March 2011, he reported to a treatment provider that "[h]e does raise sheep and does run a farm and continues with all of his regular duties." R. 1562. Indeed, he reported doing "farm work" for exercise, walking for exercise (and losing nearly 20 pounds), and was encouraged to swim and/or bike. At a March 2012 dietician consult, Plaintiff reported that "he runs a lamb/sheep farm," and has a "pattern of irregular meals due to farm work, caring for elderly parents, and being a single dad to his four sons (cooking for them, caring for them, and attending their school & sports activities)." *Id.* June and August 2012 visits, the ALJ noted, document similar reports as to family responsibilities and farm chores, as well as spending two weeks "living at the state fair and showing his animals." *Id.*

Notwithstanding his detailed description of the successful surgeries to Plaintiff's left foot, the history of relatively mild findings and conservative treatment thereafter, and the nature and scope of his activities, including road trips to Minnesota and Kentucky to show his sheep, camping, and walking and using a stationary bike for exercise, the ALJ gave Dr. Malicky's opinion,

including the requirement that Plaintiff needed to have his foot elevated waist high for 75% of the workday, "great weight." R. 1563. He also gave some weight to Dr. Rupke's similarly extreme limitation, though he thought her opinion that Plaintiff would need to be absent more than four days a month "speculative" and "not consistent with the claimant's routine and conservative treatment history or his reported activities." R. 1564. Then, despite having given great weight to Dr. Malicky's opinion, specifically noting his opinion "as to the claimant's need to elevate his left leg during the workday" (R. 1563), and some weight to Dr. Rupke's opinion to the same effect, the ALJ failed to include such a limitation in Plaintiff's RFC. Instead of requiring elevation of his leg to waist level for 75% of the workday, the ALJ required that Plaintiff be "provided assistance to his work station and allowed to sit in a wheelchair with his leg elevated." Based on Plaintiff's testimony that he had continued in his previous sales position while in a wheelchair and with his leg elevated, the ALJ then found that Plaintiff was not disabled because he could perform his past job. R. 1565. But allowing an employee to elevate his leg while at work and requiring that his leg be elevated to waist level for 75% of the workday are not the same or equivalent restrictions. The VE testified at the first hearing before ALJ Ciccolini in June 2013 that such a restriction would preclude all gainful employment. R. 81–82.

The ALJ failed to explain why, despite giving Dr. Malicky's opinion "great weight," he failed to include his recommendation for leg elevation in the RFC. True, the ALJ did not say he was adopting Dr. Malicky's opinion in full. And the ALJ also gave "great weight" to the opinion of Dr. Malcolm Brahms, a medical expert who, in answering a medical interrogatory about Plaintiff's left ankle impairment, concluded that he could perform sedentary work but included no leg elevation limitation. R. 1564 (citing R. 858–66). The ALJ also gave "great weight" to the opinions of Drs. Syd Foster and Philip Cohen, the state agency consultants who reviewed

13

Plaintiff's file and likewise concluded that he could perform sedentary work without the addition of a leg elevation limitation. R. 1563 (citing R. 313–14, 454). Still, the ALJ did say he was giving Dr. Malicky's opinion great weight and specifically noted the more extreme leg elevation restriction Dr. Malicky recommended. Some explanation is required for the ALJ to have given the opinion great weight and then failing to incorporate a key part of it in the RFC. Without an explanation, the ALJ failed to build a logical bridge between the evidence and his conclusions. For this reason, the Commissioner's decision must be reversed and the case remanded.

Plaintiff argues that the court should not only reverse the Commissioner's decision but order that benefits be awarded. He claims that the ALJ's decision to grant Dr. Malicky's opinion, including the requirement that his leg be elevated to waist level 75% of the workday, mandates a finding of disability given the other evidence in the case. Rather than remand the case for yet another hearing, Plaintiff contends his application for disability since October 2010 should be ordered granted by the court. This is particularly appropriate, Plaintiff contends, because his date last insured expired at the end of 2015, thus making current evidence of his condition of little, if any, value.

"An award of benefits is appropriate, however, only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports only one conclusion—that the applicant qualifies for disability benefits." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Briscoe ex rel. Tayler v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005)). This is not such a case. As noted above, the ALJ's analysis of the evidence bearing on Plaintiff's left ankle impairment is so incomplete and inconsistent that it fails to provide a logical bridge to his conclusions. He gave great weight to inconsistent opinions and failed to explain why he only partially incorporated the key limitation (leg elevation) of the opinion he appears to have granted

14

the greatest weight (Dr. Malicky's). But this is not to say that the record supports only one conclusion. The evidence recounted by the ALJ regarding the care and treatment of Plaintiff's primary impairment, and the nature and scope of Plaintiff's activities seem inconsistent with his assessment of the expert opinions and warrant re-examination and further explanation.

Finally, Plaintiff also claims that the ALJ failed to assess his need for extra bathroom breaks due to his Crohn's disease and irritable bowel syndrome. The ALJ discussed this condition in his decision but found it to be non-severe during the relevant time period as it was controlled with medication and treatment. R. 1558. There is some support for this conclusion. The record suggests that until he appeared for a follow-up with APNP Alisha Lowden in June 2016, Plaintiff had not followed up on that condition since January 2013 and was taking only probiotics. R. 1524. Nevertheless, given the number of medical records (many duplicates) concerning the issue prior to that time and Plaintiff's reports of frequent need for bathroom breaks, a more thorough analysis of this impairment will assist in arriving at a final disposition of Plaintiff's case.

## CONCLUSION

For the reasons above, the Commissioner's decision is **REVERSED** and **REMANDED** to the Agency pursuant to 42 U.S.C. § 405(g) (sentence four). The Clerk is directed to enter judgment forthwith.

**SO ORDERED** at Green Bay, Wisconsin this 30th day of November, 2020.

s/ William C. Griesbach
William C. Griesbach
United States District Judge
